The next matter on our calendar is In Re Foreign Exchange Benchmark, a class case versus the parties are Keith Cornell versus Havenfield Retirement Systems, who are the class beneficiaries, I assume. Good morning, Your Honors. My name is John Pence on behalf of appellants Keith Cornell and Crown and Cornell, two of the fee objectors in this $2.3 billion settlement arising out of the fixing of spreads in the benchmark foreign currency market. The District Court awarded a $300 million fee here in a case that had little risk, enormous prior government involvement, and early settlements of $2 billion that eliminated all risk of non-recovery, which is the risk that matters. Class counsel talk about the fact that even after nine defendants settled, there were still six additional defendants that held out for an additional period of time. But it's not the risk that you won't succeed against every defendant. It's the risk that you'll take a loss in the case, that you won't recover your attorney's fees. The nine settlements as of June 2015 were more than enough to cover all of class counsel's attorney's fees for this case, including their $174 million ultimate load star, would still have been easily covered by that $2 billion with a multiplier for the time that class counsel incurred prior to that first settlement, which was really the only risk-exposed time in this case. The District Court focused on the benchmark method of awarding a fee rather than looking at the risk, but I believe the District Court miscalculated the benchmark, number one, by including cases from outside the Second Circuit, most notably the LCD case from the Ninth Circuit. The Ninth Circuit awards fees of — The District Court was looking for cases of comparable size and difficulty, so she wasn't really limited to the Second Circuit. Isn't that correct? Well, not if you believe that the Second Circuit in Goldberger adopted a different method of awarding fees that is not benchmark-based, but looks at the facts of each individual case, including risk and, most importantly, fee agreements in other comparable cases. And that's what my client put in a fee agreement between the State of Mississippi, a sophisticated legal consumer, institutional plaintiff that files a lot of these cases, a lot of megafund cases, and that fee would have called for a — or that fee agreement would have called for a fee, in this case, of 5 percent. That was entered into between a sophisticated class counsel and the State of Mississippi in the Merck case. However, that is their standard fee agreement that is — that appears on the website of the State of Mississippi that any outside counsel that wants to work and represent the State of Mississippi in a securities or antitrust case has to agree to. And that's something that, you know, didn't exist in 2000 when Goldberger was issued. I know the Court there referred to fee agreements as the ideal proxy, the best evidence of what the market rate is. However, at the time, the Court said it may be difficult to find those. In the intervening 20 years, we now have a lot of evidence of what that is. In the Petrobras case, which coincidentally came out about — the settlement was announced about the same time as this settlement, and that was before Judge Rakoff, there was a fee agreement in place that called for a 9 percent fee in that case. But despite that, Judge Rakoff felt that because of the size of the settlement and the enormous fee that would result, he awarded a 5.7 percent fee. So even though he departed from the fee agreement, the agreement certainly established a cap. Class counsel claimed that they put in evidence, what they call competing evidence, of what — of fee agreements that range from 25 to 40 percent. So, I mean, certainly those must have come from mass tort cases, because there's no — you know, there's no institutional plan if it would ever agree to such a fee in a large mega fund, billion-dollar case. Class counsel requested 16 percent fee, right? 16.5, yes, Your Honor. Only awarded 13.1? Correct, yes. So she reduced it? She did. She did reduce it to a certain extent, based on her finding of this benchmark figure. But after calculating the benchmark based on some certain cases that just don't — just aren't similar to this case, the LCD case I mentioned, air cargo is not similar. That was a group of settlements that would reach piecemeal over several years. They were not treated as a mega fund by the judge in the Eastern District, so that's not relevant. NASDAQ predates Goldberger. NASDAQ represented a multiplier of four, that fee. So I assume that the risk in that case was quite high. Credit default swaps, another case relied on by Judge Schofield, the multiplier in that case was six. So again, we have to assume there was a very high degree of risk there. Judge Schofield herself held that this case had low risk because of the prior government investigation, followed by guilty pleas, followed very quickly. As soon as they — J.P. Morgan agreed to a settlement and a guilty plea with the DOJ, all these other defendants called class counsel and said — and asked to discuss a settlement. There had been no discovery — Not all. Not all of them, but — well, six — nine of them eventually by June of 2015 had done so. Did the district court say that there was no risk involved at all? I don't remember seeing that. I believe her comment was the risk decreased with each successive settlement. Yet she didn't ask for the Lodestar to be broken down by year, which would be relevant if you're confronting a situation of continually decreasing risk. You'd want to know, well, what Lodestar was incurred in the first, say, 16 months of this case when, yeah, there was a risk that you might not have recovered anything. And then after that point, after $2 billion was in escrow, you know, class counsel knew that they could bill, you know, as much as they did to this case, and they had no risk of not recovering that, at least that. Before you run out of time, could you quickly address the issue of gross versus net expenses and calculating based on those two? Yes, Your Honor. I think class counsel acknowledged it's a case of first impression in the Second Circuit. I think there have been some good opinions in the IPO case saying, you know, why should class counsel get an additional percentage for recovering their own expenses and having those reimbursed? The Seventh Circuit has some very good cases on that. Well, the argument is to incentivize the investment of resources rather than discouraging it. Well, I agree, Your Honor. It would do that, and it may lead to, you know, class counsel being somewhat profligate if they know that that can be a profit center as well as, you know, fees. But I just believe it's inconsistent with the common fund doctrine that a reimbursement of expenses is a benefit to the class. It's class counsel argue that it's like Vilhelmina where this Court held that Cypre should be counted as part of the common fund, but I don't believe that compensation of class counsel's expenses, litigation expenses could be construed as Cypre. But it benefits the class members, doesn't it? What they spent on getting... Well, it benefits the class members because they wouldn't be on the hook for those expenses if the case didn't settle. It's really more a benefit to class counsel, directly a benefit to class counsel, and that's the Seventh Circuit. With a successful recovery, why aren't the costs a benefit to the class members who got the recovery, who will get it at some point? Why don't they benefit from that $22 million? Well, I suppose they're co-beneficiaries with class counsel is what the Seventh Circuit said, and therefore they shouldn't be charged with the entire amount of the expenses. Well, I mean, the expenses are coming out of the recovery in any event. They're paying an additional $2.9 million for class counsel's recovery of those. That's the issue. Should they be paying a premium on top? There's no question that they should reimburse the expenses off the top. The question is, should class counsel get an additional attorney's fee for recovering their own expenses? All right. You've returned two minutes for rebuttal. Thank you. We'll hear from opposing counsel representing the class members. Is that correct? Haverhill Retirement System and others. May it please the Court. My name is Christopher Burke. I represent the plaintiffs in the trial court in front of Judge Schofield, and I'm representing the plaintiffs before this Honorable Court. We're here on an abusive discretion standard. It's an appeal of an award of an attorney fee based on the common fund, 13 percent of the common fund without interest. What did Judge Schofield do? The appellant asserts that Judge Schofield blindly adopted a 13 percent benchmark and was, and I quote, willfully ignorant of the risk facing plaintiff's counsel. This is from a court who's had a very hands-on view of the litigation over five years. Lee counsel appeared before the court dozens of times. We provided the court with bimonthly status reports. She presided over three motions to dismiss, over one, two, three, four preliminary approval hearings, the final approval hearing, adjudicated numbers of discovery disputes. She was well aware of the risk facing us, and she was well aware of the labor that class counsel undertook on behalf of the class. And of course, risk under Goldberger has to be evaluated ab initio. You evaluate risk at the start of the case. Judge Easterbrook in the Seventh Circuit warns against hindsight bias, that is, looking backward to say, well, the case wasn't maybe as risky as we thought it was. What about after the first few banks settled? Sure. J.P. Morgan, we had an agreement in principle with them in January of 2015, and a number of other settlements occurred as well during 2015. During that time, the case was expanded 98 percent. This is called In Re FX Antitrust Benchmark Litigation. It was initially restricted to the benchmark. That's about 2 percent of the daily volume. We expanded it and therefore increased the risk of what we'd have to demonstrate. At preliminary approval, we faced three objections, objections from the non-settling defendants who were arguing that essentially it was a Canadian cars argument, which was the court shouldn't settle, shouldn't certify a settlement class now because the court should simply wait for a settlement later on. And of course, in terms of risk, we find later on the court denies 23B settlement to the OTC class and to the exchange class, prima facie evidence of how risky this case is. When we expanded the case to include exchange trading, it was originally just simply over-the-counter trading. When we expanded the case to include exchange trading, the exchange traders who brought separate lawsuits were bringing Canadian, I'm sorry, they were bringing arguments under Auction House, Literary Works and Super Spuds, essentially arguing that the exchange traders hadn't been adequately represented in the initial settlements. So what did we do? We worked out a system whereby we had allocation counsel for the OTC class, allocation counsel for the exchange class, and redid the settlements. We redid the settlements. That's why they weren't finally approved. Settlement-related work supposed to be included in the calculation of risk and litigation? Well, at the same time, we were, the settlements were not finally approved, John. This isn't like Tremont. But it sounds like most of what you just described, or a large part of it, has to do with figuring out what settlements would be, no? To the contrary. Most of the work in this case was done toward, with an aim toward preparing this case for class certification. The class certification is the off-ramp for defendants in antitrust actions. So from January 2015 up through the present, because we have a C-23, C-4 class now that we're hopefully going to be able to try, we were putting together evidence that would enable us to demonstrate How do we know how much of that work was what you're saying now versus, you know, settlement-related what you were saying earlier, if we don't have a breakdown of the hours or tasks? The question is whether or not the trial court, who has the best vantage point, had an idea, a very good idea of what plaintiffs' counsel were engaged in. And as I said, we appeared in front of her dozens of times, and we provided to the trial court bimonthly status reports that gave her a very good indication of the disputes in front of the court and what class counsel were working on. May I continue? Please. And the risk stayed with us the entire time. In 2017, we became aware of a concerted effort to opt out class members from the settlements. We became aware that certain of the representations being made to prospective opt-outs were misleading. We went to the court and we obtained, in order that compelled those entities who were soliciting opt-outs to send out corrective advertising. That didn't stop those firms. They ended up opting out 17 large entities, 17 large asset managers, which comprised thousands of individual funds. That opt-out effort triggered a mediation between the defendants and plaintiffs' counsel. A number of the defendants had buyer's remorse, meaning they thought they overpaid. The entire $2.3 billion settlement was almost blown in the spring of 2018. We had a mediation in front of Mr. Feinberg. Mr. Feinberg ultimately determines that the materiality provision in the settlement agreements that would have triggered the blow was not met. So when you're plaintiffs' counsel and you've got tens of thousands of hours in a case and you're holding $22.5 million in hard costs and the whole thing could get blown in 2018, yeah, that's risk. You feel that risk. It's palpable. Is that what you would call the risk of litigation, though? The risk of litigation in an anti-trust — that's part of the risk of litigation, sure, because if those settlements become undone, those defendants come back in the case. But this is a conspiracy case. So when we settle with J.P. Morgan, we still have to litigate with so on and so forth. We were litigating with non-settling defendants the entire way through. Even in June of 2015, when we had a framework, a framework for settlement with nine defendants, not a settlement that — it ended up being renegotiated. It hadn't been preliminarily approved yet, let alone finally approved. Even then, we were still litigating with seven non-settling defendants, represented by the cream of the anti-trust bar in New York. Has everyone settled by now? No. We're still litigating with credit suisse. As I mentioned, Judge Schofield denied the 23B3 damages classes. Now we're going forward with a 23C4 liability class to hopefully establish the existence of a conspiracy to fix spreads and to establish that credit suisse is part of that conspiracy. But you're still litigating. We're still fighting away. That's right. Can I ask you about gross and net, the issue you asked your friend about? Did the district court say anything about this issue? Yes. This is something that came up in related litigation called Barkley — Barks. It was the Barks litigation, which was an element of the foreign exchange market involving electronic trading. She was concerned in that case about what the net amount was going to be paid to class members, and I was counsel in that case. So when we brought these settlements to her in this case, she was again concerned about what are class members going to see on a net basis? Tax tipping out the door, right? Fees, expenses, claims in administration, everything. So in the settlement, we made very clear class members would pay no more than 18 percent. We initially asked for 16.5, but no more than 18 percent fees and expenses. What did Judge Schofield do? She reduces fees to 13 percent. She pays us our expenses, but she structures interest so that all the interest on the fund, including interest that would run — that would accrue on the attorney's fees, would float to the benefit of the class. So to date, $66 million has accrued net of taxes. $66 million has accrued in that fund. So if we are going to distribute in 2020, the net for the class will be — the class will see approximately 87 percent of the fund. The class will have paid — As part of that, though, did the district court address whether the 13 percent would be net of expenses incurred? She — the court awarded expenses first, then she awarded fees, so she knew that it was gross. No, but the denominator for the fees is what I'm asking about. She awarded the fees off the gross. Right. But she was — Did she address whether that was appropriate versus off the net? She addressed what the net amount the class members were going to see, so I — she had to have taken that into account. We did not have a conversation on gross versus net. We did have that conversation in the trial court. In the briefing, there's some, you know, difference in legal authority across the country about whether — what the right denominator is, and so I'm wondering whether the district court at any point addressed that specific issue or whether you're just assuming that she did based on her opinion. I can tell you what the court did address. This was — this was before the trial court, and she is — she was concerned about whether or not class members would see — she was trying to maximize the amount of money going to class members, which is why she structured the fee agreement — or the fee award the way she did, and that's why when you take into account interest, net of taxes, class members will see 87 percent of the award, and because of what we recorded for class members, they'll receive 100 percent of their damages. And in this kind of case, when you can get 100 percent of your damages, you've hit it out of the park. Thank you. Thank you. Mr. Pence, you have two minutes for — Thank you, Your Honor. Just briefly, I wanted to touch on the Tremont case. I don't believe I got to mention that the first time up. I think this case is very similar to the Tremont case decided by the Second Circuit, where the court reversed a fee award that represented a lodestar multiplier for time spent devising a plan of allocation, which it's undisputed that here a large portion of class counsel's time after June 2015 was spent devising a plan of allocation. They say that they were also working on class certification, but again, that's not an issue in the settled cases. Manageability doesn't become — is no longer a concern under AMCM. So they were working on class certification for the other defendants, the six who held out and settled later, but that doesn't mean there was risk that their fees wouldn't be paid. That's the key. The fact that there may have been what's called a blow provision, that enough people may have opted out, that the defendants would have gone back to mediation, the result of that, had Mediator Feinberg found that that was satisfied, would have been a reduction of the settlement in proportion to the opt-outs, kind of similar to what's happening right now in Visa MasterCard. A number of large plaintiffs have opted out of the Visa MasterCard case, and that has simply reduced the amount of the settlement. It doesn't mean that the settlements would go away entirely. So the blow provision risk is not one that threatened to have — threatened class counsel with losing or taking a loss in the case. And I think we really need the breakdown of the Lodestar by year and tasks, rather, so that we can know how much of class counsel's time was spent after June 2015. The Lodestar in this case was only used as a cross-check. It wasn't the basis for the fee award. Isn't that correct? Yes, Your Honor, that is correct. But the question remains, what Lodestar is proper to use for the cross-check? How much of it are you going to include? The Tremont Lodestar shouldn't be included at all. They should get that paid, reimbursed, to be sure, but not enhanced, because even though they incurred it and then had to wait to get it, the use of current hourly rates generally accounts for that delay in payment. I see my time has expired. Thank you very much. Thank you. Thank you both very much for a very good argument.